IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

REBECCA G. LANCASTER, as the Executrix of the Estate of JAMES L. LANCASTER, deceased,

Plaintiff,

vs.

BNSF RAILWAY COMPANY, f/k/a Burlington Northern and Santa Fe Railway Company,

Defendant.

4:19-CV-3110

MEMORANDUM AND ORDER

The plaintiff's husband, James Lancaster, was diagnosed with lung cancer in 2016 and died in 2018. Filing 46 at 5; filing 60 at 4. The plaintiff claims that Lancaster's lung cancer was caused by exposure to diesel exhaust, silica, or asbestos during the course of his 33-year career with the defendant, BNSF Railway Company. Filing 46 at 3; *see* filing 34. BNSF points instead to Lancaster's history of smoking cigarettes, and moves for summary judgment, arguing that the expert opinions the plaintiff relies upon as evidence of causation are unsupported and inadmissible. Filing 44; *see* filing 48; filing 50. For the reasons that follow, the Court will grant BNSF's motion to exclude the opinions of one of the plaintiff's experts, and will as a result also grant BNSF's motion for summary judgment.

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the

initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

## BACKGROUND

The two plaintiff's experts at issue are Neil J. Zimmerman, Ph.D., and Ernest Chiodo, M.D. Filing 47-7 at 1. Zimmerman's opinion is proffered to show the "notice and foreseeability" of the alleged hazards of Lancaster's employment with BNSF, "including exposure to carcinogens and the railroad industry's knowledge of the hazards of exposure to toxins." Filing 47-1 at 1. Chiodo's opinion is proffered with respect to the "nature and extent" of Lancaster's injuries "as well as their causation, both general and specific." Filing 47-1 at 1.

## ZIMMERMAN'S OPINION

Zimmerman is a certified industrial hygienist with degrees in air and industrial hygiene, environmental engineering, and mechanical engineering. Filing 47-7 at 3. His qualifications are not disputed for purposes of summary judgment. Filing 59 at 3.

Zimmerman was asked by the plaintiff's counsel to "evaluate[] the work environment and working conditions" for Lancaster "as a trackman/foreman from 1974 to 2007." Filing 51-3 at 1. In preparing to do so, he reviewed discovery materials (including air assessment reports and asbestos abatement reports), employment records, medical records, and deposition testimony and evidence provided by Larry Fransen, Lancaster's supervisor from 1980 to 1984.

Filing 51-3 at 1-3. Zimmerman also spoke to the plaintiff and two of Lancaster's co-workers: Dan Williams, who worked with Lancaster from about 1990 to 2000; and Craig Whitlock, who worked for BNSF from approximately 1974 to 2006 and was, according to Zimmerman, "familiar with the types of work [Lancaster] performed for his entire career." Filing 51-3 at 2.

In his expert report, Zimmerman discussed various tasks that Lancaster would have performed during his career and how those tasks might have exposed him to hazardous substances. To begin with, Lancaster's duties when he was a section foreman required a few hours of office work a day, and Zimmerman opined that Lancaster "had the potential for periodic exposure to asbestos fibers throughout his career from working in buildings that contained asbestos." Filing 51-3 at 3. Rail repair during the winter—at least, during the '80s—could involve heating the rails with asbestos ropes soaked in diesel fuel and ignited, periodically exposing Lancaster to diesel fumes. Filing 51-3 at 3. And ballast dumping involved rock trains carrying ballast rock and adding new or additional ballast where necessary. Filing 51-3 at 4. That was "a dusty job" requiring workers to be close to the ballast cars and, before ballast wetting to control the dust was common, workers could be covered with dust. Filing 51-3 at 4. Distributing the ballast under the ties also created dust as the ballast was vibrated. Filing 51-3 at 4. Thus, Zimmerman opines that Lancaster

> would have had the potential for periodic overexposure to creosote and its vapors and products of combustion, diesel fuel combustion products and silica from ballast dust on a routine basis throughout at least the first half of his 33 year career, and after asbestos rope burning was replaced with rail pullers, his potential for overexposure to silica would have continued.

Filing 51-3 at 5.

Zimmerman wrote that "there is no way to quantitatively determine Mr. Lancaster's personal exposures to diesel fuel combustion products, asbestos and silica since there are no air monitoring data, either personal or area related directly to him of which I am aware." Filing 51-3 at 8. So, Zimmerman said, "estimates for his exposure must depend on general descriptions of his working conditions and when available, other sources of exposure data for the types of tasks that Mr. Lancaster performed." Filing 51-3 at 8. Based on that information, Zimmerman found "no way to estimate [Lancaster's] actual exposure to asbestos" and only "the potential for periodic overexposure to diesel fuel products of combustion throughout at least the first half or more of his career during the winter months." Filing 51-3 at 9-10. At his deposition, Zimmerman admitted that "there is no evidence of any level of exposure to Mr. Lancaster being exposed to products of combustion from burning diesel fuel." Filing 51-4 at 94.

But with respect to silica, Zimmerman was able to say more, explaining in his expert report that

> [Lancaster] was exposed to silica from the dust created from the dumping and tamping of ballast stone. Ballast stone can contain a significant percentage of crystalline silica which is released into the air whenever the stone is being dumped or disturbed. From the qualitative descriptions given by [the plaintiff], Mr. Williams and Mr. Whitlock, the silica dust exposure from ballast dumping operation in particular, which Mr. Lancaster spent a great deal of his career performing, could be very high.

Filing 51-3 at 10. So, Zimmerman concluded, Lancaster "experienced exposures to silica more likely than not greatly in excess of recognized safe levels and often at dangerously high levels." Filing 51-3 at 15.

When deposed, Zimmerman explained that the primary information he had used to reach that conclusion was BNSF air sampling data, stating that the exposures were so large for silica doing ballast dumping that there was no need to find additional data. Filing 51-4 at 10. At the time, the OSHA permissible exposure limit for silica was 100 micrograms per cubic meter, and Zimmerman opined that Lancaster would have repeatedly been exposed to amounts exceeding that limit. Filing 51-4 at 108-09, 134. Those exposures would also have exceeded the threshold limit value of 50 micrograms per cubic meter established by the National Institute for Occupational Safety and Health. Filing 51-4 at 108, 134-35.

## CHIODO'S OPINION

Chiodo is a medical doctor with degrees in, among other things, public health, evidence-based health care, occupational and environmental health sciences, and biomedical engineering. Filing 58-1 at 1-2. He's board-certified in internal medicine, occupational medicine, and public health and general preventative medicine. Filing 49-3 at 2. His qualifications are also undisputed for purposes of summary judgment. Filing 59 at 3.

Chiodo was asked by the plaintiff's counsel to "review records in this matter to render an opinion as to whether or not there is a causal relationship between the railroad work place exposures of Mr. James L. Lancaster and his development of squamous cell lung cancer." Filing 49-3 at 1. In preparing to do so, he reviewed discovery materials, employment records, the plaintiff's deposition, medical records, and Zimmerman's expert report. Filing 49-3 at 3.

He also spoke to the plaintiff and Zimmerman, and searched peer-reviewed literature. Filing 49-4 at 5-6. Chiodo concluded, in his expert report, that

> The likely causes of Mr. Lancaster's lung cancer include his silica exposure, diesel exposure, and asbestos exposure. None of these causes can be eliminated. The differential diagnosis of etiology indicates that the causes of Mr. James Lancaster's lung cancer are his exposure during the course of his railroad employment to silica, diesel exhaust, and asbestos as well as his history of smoking. His exposure to silica as well as his smoking history is known to cause lung cancer.
>
> The likely causes of Mr. James Lancaster's lung cancer include his railway exposure to silica, diesel exhaust, asbestos, and his smoking history. None of these causes can be eliminated. The differential diagnosis of etiology indicates that the causes of Mr. James Lancaster's lung cancer are his railroad exposure to silica, diesel exhaust, and asbestos as well as his smoking history.

Filing 49-3 at 9.

At his deposition, Chiodo explained that his opinion on causation was predicated on Zimmerman's opinion regarding Lancaster's exposure to hazardous substances. Filing 49-4 at 13-14. But—contrary to the evidence as recited above—Chiodo described Zimmerman's opinion as stating that "Lancaster was exposed to silica, asbestos and diesel exhaust above and beyond what the average person would be exposed to." Filing 49-4 at 54.

In discussing Lancaster's history of smoking, Chiodo admitted that "yes, cigarette smoking alone can cause lung cancer without any known other

- 6 -

exposure risks." Filing 49-4 at 94. But, Chiodo said, he couldn't agree that Lancaster's lung cancer could have been caused solely by a 40-year history of smoking cigarettes, "because that's not the history. He didn't solely smoke cigarettes, he was exposed to asbestos, diesel fumes, exposed – diesel combustion fumes as well as being exposed to asbestos." Filing 49-4 at 93. Chiodo claimed that the issue, as he saw it, wasn't whether Lancaster's lung cancer could be attributed to his exposure to any particular substance—rather, the issue was whether the lung cancer could be attributed generally to working for the railroad. *See* filing 49-4 at 54-55, 97-98. As he explained:

> By the way, my opinions about general causation are not solely oh, his lung cancer was caused by asbestos or diesel exhaust or silica.
>
> The question is was it his employment at the railroad. Yes, his employment at the railroad. If you say well, we don't think asbestos was a problem. You know, I can tell you Dr. Zimmerman thinks it was.
>
> But say that was taken out. He still has diesel exhaust exposure. That's an exposure at the railroad because that's the issue, work at the railroad.
>
> Did work at the railroad cause his - was it a cause of his lung cancer? Silica, same issue. So I've just told you, I believe – and when we start talking about the carcinogenetic effects for any of them, asbestos, silica or diesel, there's no threshold level.
>
> So in my opinion his exposures at the railroad were the cause of his lung cancer. If you want to argue to a court to say well, we

don't think it was asbestos. Well, how about diesel exhaust, how about silica?

He doesn't have to have all three.

Filing 49-4 at 54-55. As he concisely stated later, "[t]he issue to me is not did Mr. Lancaster get lung cancer from asbestos, not did he get it from diesel, not did he get it from silica, did he get it from his work." Filing 49-4 at 97-98. So, Chiodo opined as follows:

> My opinion is that his occupation which based upon what I believe will be the testimony of Dr. Zimmerman included exposure to asbestos, silica and diesel exhaust beyond what the average person would be exposed to.
>
> So there is my opinion more likely than not to a reasonable degree of certainty that a cause but not necessarily the sole cause of his lung cancer was his occupation.
>
> Now, a cause that would be included in specific causation without an attribution – I'm not supposed to invade the province of the jury – a cause is his occupation, diesel exhaust, asbestos or silica, and a cause is his cigarette smoking.

Filing 49-4 at 115.

## DISCUSSION

FELA imposes upon employers a continuous duty to provide a reasonably safe place to work. *Cowden v. BNSF Ry. Co.*, 690 F.3d 884, 889 (8th Cir. 2012). FELA is to be liberally construed, but it is not a workers' compensation statute, and the basis of liability is "negligence, not the fact that

- 8 -

injuries occur." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994). So, the plaintiff must prove the customary common law elements of a negligence claim: duty, breach, foreseeability, and causation. *Crompton v. BNSF Ry. Co.*, 745 F.3d 292, 296 (7th Cir. 2014); *Tufariello v. Long Island R. Co.*, 458 F.3d 80, 87 (2d Cir. 2006). But the Court applies a relaxed standard of causation under FELA. *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011). The test is simply whether employer negligence played any part, even the slightest, in producing the injury for which damages are sought. *Id.*

Expert evidence is often required to establish the causal connection between the injury and alleged hazard "unless the connection is a kind that would be obvious to laymen, such as a broken leg from being struck by an automobile." *Brooks v. Union Pac. R.R. Co.*, 620 F.3d 896, 899 (8th Cir. 2010) (quoting *Moody v. Me. Cent. R.R. Co.*, 823 F.2d 693, 695 (1st Cir. 1987)). Because Lancaster's lung cancer had no obvious origin, "expert testimony is necessary to establish even that small quantum of causation required by FELA." *Id.* (quoting *Claar v. Burlington N.R.R. Co.*, 29 F.3d 499, 504 (9th Cir. 1994)). And a plaintiff must prove not only that an alleged toxin is capable of causing an injury, but that the toxin caused this particular injury. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 643-44 (7th Cir. 2010); *Claar*, 29 F.3d at 504; *see also Edmonds v. Ill. Cent. Gulf R.R. Co.*, 910 F.2d 1284, 1288 (5th Cir. 1990) ("plaintiff must show more than a *possibility* that a causal relation existed"); *Mayhew v. Bell S.S. Co.*, 917 F.2d 961, 963 (6th Cir. 1990) (quoting *Moody*, 823 F.2d at 695) ("[A]lthough a [FELA] plaintiff need not make a showing that the employer's negligence was the *sole* cause, there must be a sufficient showing (i.e. *more than a possibility*) that a causal relation existed.").

The admissibility of expert testimony is governed by Fed. R. Evid. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702 the trial judge acts as a "gatekeeper" screening evidence for relevance and reliability. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589 (1993); *Polski v. Quigley Corp.*, 538 F.3d 836, 838-39 (8th Cir. 2008).

The objective of the *Daubert* inquiry is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Am. Auto. Ins. Co. v. Omega Flex, Inc.*, 783 F.3d 720, 722 (8th Cir. 2015). And in order to be admissible, expert testimony must be both relevant to a material issue and reliable. *Daubert,* 509 U.S. at 591; *see also Margolies v. McCleary, Inc.*, 447 F.3d 1115, 1120 (8th Cir. 2006); *see* Fed. R. Evid. 702.

*Daubert* established a non-exhaustive checklist for trial courts to use in assessing the reliability of expert testimony, including whether the theory or technique can and has been tested, whether it has been subjected to peer review, whether there is a high known or potential rate of error, and whether the theory or technique enjoys general acceptance within a relevant scientific community. *See U.S. v. Holmes,* 751 F.3d 846, 850 (8th Cir. 2014) (citing *Daubert,* 509 U.S. at 592-94). And for the purposes of evaluating the relevance of expert testimony, the Court must determine whether the expert's reasoning

or methodology was applied properly to the facts at issue. *Daubert,* 509 U.S. at 580. To that end, expert testimony that is speculative, unsupported by sufficient facts, or contrary to the facts of the case, is inadmissible. *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006). A district court is not required to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. *Id.*

BNSF's argument in this case is that neither Zimmerman's nor Chiodo's opinion is admissible, and that without those expert opinions, the plaintiff cannot prove her case. Filing 46 at 2. The Court will start with Zimmerman: BNSF argues that

> Dr. Zimmerman did not identify any job task that he was aware that Mr. Lancaster actually performed that could have contributed to exposure to diesel exhaust, silica, or asbestos. As a result, Dr. Zimmerman's opinions with regard to Mr. Lancaster's exposure to diesel exhaust, asbestos, and silica are purely the product of speculation and flawed reasoning. Moreover, Dr. Zimmerman could not identify any exposure amount experienced by Mr. Lancaster that would have placed Mr. Lancaster at an increased risk above background.

Filing 51 at 2-3.

It is true, as BNSF points out, that Lancaster's precise job tasks aren't conclusively established: we don't have a day-by-day log of what he did on the job and how he did it—and obviously, we can't ask him. To fill in the gaps, Zimmerman relied on personnel records from BNSF, the plaintiff's recollection

of what Lancaster might have said, and information from others who worked with Lancaster or performed similar jobs at around the same time. Filing 51-3 at 2. The primary thrust of BNSF's argument is that Zimmerman failed to ask those people a number of questions that, according to BNSF, were essential to his opinion. *See* filing 51 at 6-9. The Court is not persuaded that the questions Zimmerman *did* ask were insufficient. Any deficiencies in Zimmerman's interview technique go to the weight, not admissibility, of his opinions.

And to his credit, Zimmerman's opinions regarding all the alleged hazards were well-tailored to the foundation laid for them, because Zimmerman was unwilling to definitively opine regarding exposures that were based only on speculation. Zimmerman did, definitively, identify one substance to which Lancaster was exposed at quantities above background: silica. BNSF's argument that Zimmerman didn't testify to an increased *risk* above background is something of a red herring, because while Zimmerman did discuss carcinogenic risks, that was simply how he identified which exposures to assess—he was asked to testify about exposure, not causation.

Zimmerman's carefully circumscribed opinion, however, is precisely the problem when it comes to Chiodo's opinion—or, at least, the first of several problems. Specifically, there are four primary (somewhat related) issues with Chiodo's opinion:

1) Chiodo's opinion lacks foundation because it is premised on a misunderstanding of Zimmerman's expert report;

2) Chiodo did not explain how exposure to substances presenting an increased *risk* of cancer became an opinion that one of them more likely that not *was* a cause of Lancaster's cancer—in other words, Chiodo did not explain

>   how his opinion on general causation warranted his opinion on specific causation;
>
> 3) Chiodo did not conduct a reliable differential etiology; and
>
> 4) Chiodo did not—and expressly refused to—opine that exposure to silica was more likely than not a cause of Lancaster's cancer.

To begin with, Chiodo's opinion lacks adequate and reliable foundation because Chiodo's opinion is purportedly based on Zimmerman's—but Chiodo attributed conclusions to Zimmerman that, if they existed at all, can't be found in the record. Chiodo's opinion was expressly premised on the opinion he apparently *expected* from Zimmerman: that Lancaster had been exposed to above-background rates of asbestos *and* diesel combustion fumes *and* silica. *E.g.* filing 49-4 at 115. But Zimmerman was unable to opine to any degree of certainty about Lancaster's exposure to asbestos or diesel combustion fumes.

The most basic element of foundation for an expert opinion is whether the "testimony is based on sufficient facts or data." Rule 702(b). An expert opinion is insufficient when it isn't supported by sufficient facts to validate it in the eyes of the law, or when the facts of record contradict it or otherwise render it unreasonable. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000). Here, the basic "facts" of the case upon which Chiodo's opinion was based—the facts regarding Lancaster's exposure to hazardous substances, as found by Zimmerman—were fundamentally misunderstood by Chiodo. To be relevant, the proponent of expert evidence must show that the expert's reasoning or methodology was applied properly to the facts at issue. *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010). Here, Chiodo's methodology was applied to facts unsupported—indeed, contradicted—by the record.

But Chiodo's opinion would have been flawed even had Zimmerman said what Chiodo thought. According to Chiodo, Lancaster was exposed—or at least, might have been exposed—to at least four carcinogenic risks: asbestos, diesel combustion fumes, silica, and cigarettes. So, Chiodo opined that Lancaster's lung cancer could have been caused by any of those. But as this Court explained in *McLaughlin v. BNSF Ry. Co.*, an expert cannot simply assert that an employee was exposed to some unknown amount of a potential carcinogen, and some unknown amount of that potential carcinogen can cause cancer, so therefore exposure to that carcinogen *did* cause the employee's cancer: that's "just the type of opinion that is connected to the data only by the *ipse dixit* of the expert, and need not be accepted by the Court." 439 F. Supp. 3d 1173, 1183 (D. Neb. 2020). The fact that Chiodo was willing to render that opinion even *without* evidence of exposure to two of the potential carcinogens does not make his opinion more acceptable.

It is true that Chiodo said he performed a differential diagnosis, and a differential diagnosis (or, more precisely, etiology) is a presumptively admissible, valid foundation for a opinion on specific causation. *See Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001); *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1209 (8th Cir. 2000). But that would have required Chiodo to "rule in" all scientifically plausible causes of Lancaster's cancer, and then "rule out" the least plausible causes of injury until the most likely cause remains. *See Glastetter*, 252 F.3d at 989. That's not what he actually did. Instead, he "ruled in" causes, as described above, for which there was no evidence. And then he didn't rule them out, despite the lack of evidence.

Chiodo's own deposition testimony illustrates the problem: he noted that one possible cause of lung cancer is exposure to radon. Filing 49-4 at 139. But, he said, he could rule out radon because Zimmerman had not found any

- 14 -

exposure to radon and there was no mention of radon in the evidence. Filing 49-4 at 150-51. And that was entirely appropriate. But there's no more evidence of asbestos exposure in this case than of radon exposure, and no explanation of why the two hazards were treated differently (other than, again, Chiodo's fundamental misreading of Zimmerman's report).

And even if Zimmerman's testimony provided a basis to rule in *some* potential causes of cancer, Chiodo failed to rule out smoking as a non-workplace cause of Lancaster's cancer. *See Turner*, 229 F.3d at 1209; *see also Byrd v. Union Pac. R.R. Co.*, 453 F. Supp. 3d 1260, 1271-72 (D. Neb. 2020); *McLaughlin*, 439 F. Supp. 3d at 1182-84. As the Court explained in *McLaughlin*, "when smoking is raised by the defendant as a possible sole cause, differential etiology requires a medical professional to rule that possibility out." 439 F. Supp. 3d at 1183-84. And Chiodo agreed that "lung cancer itself solely without exposure to diesel, asbestos or silica [can] cause lung cancer" and that "cigarette smoking alone can cause lung cancer without any known other exposure risks." Filing 49-4 at 93-94.

But when asked directly whether Lancaster's lung cancer "could have been caused solely by a 40 year pack history of smoking cigarettes," Chiodo said the question was asking him "to assume a fact that's not consistent with what I understand about the exposure and I can't answer that question." Filing 49-4 at 93-94. Chiodo's refusal to rule out cigarette smoking as the sole cause of Lancaster's cancer means that his differential etiology cannot support his asserted opinion on specific causation.

Nor, for that matter, would an opinion that Lancaster's cancer *could* have been caused by different things—some of which were in the workplace, some of which could have been, and some of which weren't—be helpful to the jury in the absence of any way for the jurors to determine which was which.

The evidence here, taken in the light most favorable to the plaintiff, is that Lancaster was exposed to cigarettes and excessive quantities of silica dust. But Chiodo never opined, to any degree of certainty, that silica dust was a cause of Lancaster's cancer. Instead, he said it didn't matter whether Lancaster was exposed to asbestos or diesel combustion fumes or silica: "By the way, don't need all three of them, only need one of them for my opinion more likely than not to a reasonable degree of certainty that the exposure that he had could in fact be a cause, but not necessarily the sole cause, of his lung cancer." Filing 49-4 at 123. Chiodo expressly didn't say that exposure to silica dust was a cause—even just a contributing cause—of Lancaster's lung cancer. Instead, he said it could have been.

But to opine that a particular substance *could* have been a cause of lung cancer is simply to testify to *general* causation—that is, to opine that the substance is cancerous. An opinion on specific causation requires testimony, to a reasonable degree of medical certainty, that a substance *did* cause the harm alleged. *See Junk v. Terminix Int'l Co.*, 628 F.3d 439, 450 (8th Cir. 2010). Stated another way, Chiodo's testimony didn't bridge the gap between general and specific causation, nor did it distinguish between the hazards that FELA required BNSF to protect Lancaster from and the hazard that it didn't—or, in other words, "it did not separate lawful from unlawful conduct." *See Concord Boat Corp.*, 207 F.3d at 1057. Simply put, Chiodo's opinion would give the jury an insufficient basis to conclude that silica dust was a cause of Lancaster's cancer, nor would it give the jury any basis to determine whether or not Lancaster's cancer could have resulted solely from cigarette smoking.[1]

---

[1] The Court's decision in *Bettisworth v. BNSF Ry. Co.*, is plainly distinguishable: in that case, Chiodo performed a reliable differential diagnosis based on an industrial hygienist's report that narrowed the decedent's exposure risk to diesel exhaust, excluding causes for which

- 16 -

To summarize: Chiodo's opinion lacks sufficient foundation, in that it was premised on "facts" that aren't supported by the record. There is no analytical connection between his opinion and the facts of the case. And beyond that, his opinion wouldn't be helpful to the trier of fact, because it does nothing to help the jury determine which cause or causes were more likely than not to have contributed to Lancaster's lung cancer, and whether or not BNSF was responsible. The plaintiff has shown no more than a possibility—and perhaps not even that much—that silica or any other workplace hazard caused his disease. A jury simply could not determine, based on Chiodo's opinion, whether or not Lancaster's cancer resulted from BNSF's alleged failure to protect him from hazards in the workplace. Accordingly,

IT IS ORDERED:

1. BNSF's motion to exclude Zimmerman's opinion (filing 50) is denied.

2. BNSF's motion to exclude Chiodo's opinion (filing 48) is granted.

3. BNSF's motion for summary judgment (filing 44) is granted.

---

there was no evidence, and opining that diesel exhaust was a cause (although not necessarily the sole cause) of the decedent's lung cancer. No. 8:17-cv-491, 2020 WL 3498139, at *7-8 (D. Neb. June 29, 2020). In this case, however, Chiodo did not rule out potential causes for which there was little to no evidence, and he refused to render an opinion specific to the workplace hazard that the industrial hygienist identified as a significant exposure risk.

4. The plaintiff's complaint is dismissed.

5. A separate judgment will be entered.

Dated this 29th day of September, 2021.

BY THE COURT:

John M. Gerrard
United States District Judge